**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-_____

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**

    Plaintiff,

v.

**WATERWAY GAS & WASH COMPANY,**

    Defendant.

## COMPLAINT

## NATURE OF THE ACTION

This is a public enforcement action under Title I of the Americans with Disabilities Act of 1990, as amended ("ADA"), and Title I of the Civil Rights Act of 1991 against Defendant Waterway Gas and Wash Company ("Waterway") to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Tyson Aoyagi, an individual with a disability as defined by the ADA. As alleged with greater particularity below, the Equal Employment Opportunity Commission ("EEOC" or "Commission") alleges Waterway failed to accommodate Aoyagi and terminated his employment because of his disability and/or the need to accommodate his disability. The EEOC further alleges that Waterway retaliated against Aoyagi because he engaged in protected activity.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345. This action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-5(f)(1) and (3); Section 503 of the ADA, 42 U.S.C. § 12203; and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

## PARTIES

3. The EEOC is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title I of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

4. At all relevant times, Waterway, a Missouri corporation, has continuously been doing business in the State of Colorado.

5. At all relevant times, Waterway has continuously had at least 15 employees.

6. At all relevant times, Waterway has continuously been an employer engaged in an industry affecting commerce under Sections 101(5) and 101(7) of the ADA, 42 U.S.C. §§ 12111(5) and (7).

7. At all relevant times, Waterway has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

8. Waterway represents itself to the public as "a nationally recognized leader in the car wash industry."

9. Waterway operates 20 locations in five cities and four different states.

10. Each Waterway location offers car wash services, gasoline, snacks, drinks, and merchandise.

## ADMINISTRATIVE PROCEDURES

11. More than 30 days prior to the institution of this lawsuit, Tyson Aoyagi filed a charge of discrimination with the EEOC alleging violations of the ADA by Waterway.

12. The EEOC provided Waterway with notice of the charge of discrimination.

13. The EEOC investigated the charge of discrimination.

14. Based on the evidence obtained during the investigation, the EEOC issued a determination finding reasonable cause to believe that Waterway engaged in certain unlawful employment practices identified in the determination.

15. The EEOC's determination included an invitation for Waterway to join the EEOC in informal methods of conciliation in an attempt to eliminate the alleged unlawful employment practices.

16. The EEOC and Waterway were unable to reach an agreement through the conciliation process.

17. On August 22, 2019, the EEOC sent notice to Waterway that conciliation efforts had failed.

18. All conditions precedent to the institution of this lawsuit have been fulfilled.

## **GENERAL ALLEGATIONS**

19. Tyson Aoyagi is a qualified individual with a disability as defined under the ADA.

20. Aoyagi has epilepsy.

21. Aoyagi was unaware of his epilepsy when he first began working at Waterway.

22. Aoyagi now takes medication for his epilepsy.

23. Aoyagi's epilepsy substantially limits his neurological functions.

24. At all relevant times, Aoyagi has held a valid Colorado driver's license.

25. On or around September 11, 2016, Waterway hired Aoyagi as a Line Associate at its Lone Tree, Colorado location.

26. Aoyagi's primary job duty as Line Associate consisted of working as part of a team to clean cars.

27. The Line Associate position existed to clean cars.

28. Aoyagi was not hired by Waterway for his expertise in driving customer vehicles.

29. Before Line Associates at Waterway's Lone Tree location can drive customer vehicles, they must go through a certification process.

30. Line Associates are not allowed to drive customer vehicles for the first 50 hours of their employment.

31. After having worked 50 hours, the Line Associates are then trained on driving customer vehicles.

32. Training on driving customer vehicles is initially done while the new Line Associate works alongside a manager.

33. When the Line Associate is allowed to drive customer vehicles, managers will then observe the Line Associate to assess their driving performance.

34. Line Associates can work at the Lone Tree location before they are certified to drive customer vehicles.

35. Line Associates who are not certified perform job duties other than driving customer vehicles.

36. During a typical shift, multiple Waterway employees at the Lone Tree location are certified to drive customer vehicles.

37. Line Associates at the Lone Tree location typically work in pairs.

38. One Line Associate in the pair typically drives the car into and out of the car wash.

39. Both Line Associates in the pair then work together to dry and clean the car.

40. Waterway typically has two to three pairs of Line Associates working during a shift.

41. Waterway may have up to four pairs of Line Associates working during a shift.

42. During busy shifts, there is usually a designated Line Associate who drives the cars into and out of the car wash for all the Line Associate pairs.

43. While working at Waterway, Aoyagi had training as a cashier.

44. While working at Waterway, Aoyagi worked night shifts as a cashier.

45. On or around May 2017, the general manager of the Lone Tree location was Amy Fjeldsted.

46. Fjeldsted was a manager and Waterway's agent.

47. Fjeldsted described Aoyagi as a wonderful employee.

48. Fjeldsted described Aoyagi as having a strong work ethic.

49. Fjeldsted described Aoyagi as a team player.

50. Fjeldsted described Aoyagi as having a positive attitude.

51. On or around May 19, 2017, Fjeldsted interviewed Aoyagi for a Team Leader position.

52. There is no job description for the Team Leader position.

53. The Team Leader position includes certain job functions of the Cashier, Service Consultant, and Line Associate positions.

54. The Team Leader position is a promotion from Line Associate.

55. During the interview, Fjeldsted conveyed to Aoyagi that the position was likely his.

56. After Aoyagi's interview, Fjeldsted gave Aoyagi paperwork to fill out.

57. The paperwork included a Team Leader promotion checklist.

58. Fjeldsted also assigned Aoyagi cashier and sales consultant training.

59. On or around May 20, 2017, Aoyagi started training for the Team Leader position.

60. On or around May 20, 2017, Aoyagi was training with Marissa Roller, a Waterway employee.

61. While training, Aoyagi had a seizure.

62. A video camera at the Lone Tree location recorded Aoyagi's seizure.

63. Upon information and belief, Fjelsted later showed the video recording of Aoyagi's seizure to other Waterway employees at the Lone Tree location.

64. After his seizure, Aoyagi was taken to the hospital by ambulance.

65. Aoyagi was released from the hospital that same day.

66. On or around May 22, 2017, Aoyagi emailed Fjeldsted to check in and see if she needed him to work that week.

67. Aoyagi did not receive an email response.

68. On or around May 26, 2017, Fjeldsted emailed Aoyagi and attached paperwork to be filled out by his doctor.

69. Later that same day, Aoyagi emailed Fjeldsted.

70. Aoyagi reported in his email that his doctor put him on medication and said "[he] would be ok to return to work."

71. Aoyagi also said he felt much better and inquired about what he needed to do to be cleared to return to work.

72. Aoyagi expressed that he would like to return to work "as soon as possible."

73. Aoyagi later emailed that his doctor would not be in the office until Tuesday.

74. Aoyagi added that Tuesday would likely be the soonest he could get a doctor's slip memorializing that he could return to work.

75. On or around May 30, 2017, Aoyagi emailed Fjeldsted stating that he would be getting his return-to-work slip that day.

76. Aogayi said he would try to bring the slip to Waterway sometime that day or the next day.

77. On or around May 30, 2017, Aoyagi met with his treating physician, Dr. Richard Clemmons.

78. During the visit, Aoyagi provided Dr. Clemmons with a return-to-work release from Waterway.

79. Dr. Clemmons checked on the release that Aoyagi could perform six of the seven categories of job duties and could work in all three of the listed work environments.

80. The only restriction Dr. Clemmons placed on Aoyagi was a driving restriction.

81. Dr. Clemmons wrote that Aoyagi must be free of seizures for three months (until August 21, 2017) before he could drive.

82. Aoyagi's driver's license was neither suspended nor revoked during this time.

83. On or around May 31, 2017, Aoyagi gave the return-to-work release with the driving restriction to Fjeldsted.

84. Aoyagi was put on the schedule for three shifts during the week of June 5, 2017.

85. On or around June 1, 2017, Fjeldsted called Aoyagi.

86. Fjeldsted asked Aoyagi if his driver's license had been suspended.

87. Aoyagi responded that his license had not been suspended.

88. Fjeldsted also asked Aoyagi if Waterway could run a motor vehicle check on him.

89. Aoyagi said Waterway could run the motor vehicle check.

90. Later that day, Fjeldsted called Aoyagi a second time.

91. Fjeldsted informed Aoyagi that Waterway's corporate office wanted her to have Aoyagi resign from Waterway.

92. Aoyagi told Fjeldsted that he needed to talk to his parents.

93. Later that afternoon, Aoyagi emailed Fjeldsted asking her to clarify exactly what she wanted him to do and fill out.

94. Fjeldsted responded: "We need some type of resignation letter. It can be simple. The minimum that we need is your name, the effective date, your current address, and current phone number."

95. Aoyagi responded that he would not resign from Waterway.

96. Aoyagi also requested reasonable accommodation.

97. He wrote: "I believe you guys would need to help me set up reasonable accommodation."

98. Fjeldsted responded that they would talk when she returned on Tuesday and Aogayi could not work until they met.

99. On or around June 6, 2017, Aoyagi emailed Fjeldsted to ask her if she had an update on his request for reasonable accommodation.

100. Fjeldsted told Aoyagi that he needed to come in and meet with her.

101. That same day, Aoyagi met with Fjeldsted at the Lone Tree location.

102. Fjeldsted again asked Aoyagi to voluntarily resign.

103. Fjeldsted told Aoyagi that if he voluntarily resigned, he would be eligible for rehire in August and he could apply for the Team Leader position.

104. Aoyagi told Fjeldsted that he would not resign.

105. Aoyagi asked Fjeldsted for an update on his reasonable accommodation request.

106. Fjeldsted told Aoyagi that no accommodation could be made for him.

107. Fjeldsted also told Aoyagi that if he did not resign, she would have no option but to discharge him at the direction of Waterway's corporate office.

108. Aoyagi requested some form of documentation showing that he was being involuntarily terminated.

109. Fjeldsted responded that Waterway's corporate office would provide him with the documentation.

110. Aoyagi was given his final paycheck and provided two dates to return his uniforms.

111. On or around June 6, 2017, Waterway discharged Aoyagi.

112. On the June 6, 2017 discharge form, Waterway stated that Aoyagi was terminated for "4800-Violation of Company Policy," which was further described as "[f]ailure to maintain valid driver's license."

113. After Aoyagi was discharged, he emailed Fjeldsted on June 8, 2017 inquiring about his termination.

114. Aoyagi informed Fjeldsted that he had "not heard or received anything" from Waterway's corporate office on why he was terminated from his job.

115. Aoyagi asked for documentation or a response to his email stating why he was terminated from his job.

116. Aoyagi also stated that he had expected to fill out a form regarding his request for reasonable accommodation, but he understood from his meeting with Fjeldsted that Waterway's position was that absolutely no reasonable accommodation could be made.

117. Aoyagi asked for documentation from Waterway on why his request for reasonable accommodation was denied.

118. Aoyagi did not receive a response from Fjeldsted or Waterway to his June 8, 2017 email.

119. On June 22, 2017, Aoyagi emailed Fjeldsted again to follow up.

120. He stated in his email that it had been a week since he had turned in his uniforms and he had not received a response from Fjeldsted or Waterway's corporate office to the questions in his June 8, 2017 email.

121. Aoyagi asked Fjeldsted if she was working on a response or if his email had been passed on to Waterway's corporate office.

122. Aoyagi never received a response from Fjeldsted or Waterway to his June 22, 2017 email.

123. Waterway decided to discharge Aoyagi after learning about his seizure on May 20, 2017.

124. Waterway discharged Aoyagi because he had a seizure at work on May 20, 2017.

125. Waterway discharged Aoyagi because of his disability, epilepsy.

126. At the time of his discharge, Waterway had notice Aoyagi had epilepsy.

127. At the time of his discharge, Waterway knew Aoyagi had epilepsy.

128. At the time of his discharge, Aoyagi was qualified to perform the essential functions of his job, with or without reasonable accommodation.

129. At no time did Waterway initiate or engage with Aoyagi in any interactive process to identify any precise limitations resulting from his disability.

130. At no time did Waterway initiate or engage with Aoyagi in any interactive process to identify any potential accommodations for any limitations.

131. At no time did Waterway conduct an individualized assessment of Aoyagi's capabilities and limitations and the responsibilities of his particular job.

132. At no time did Waterway consult with a medical professional on epilepsy before terminating Aoyagi.

133. At no time did Waterway consult with Aoyagi's treating physician before terminating Aoyagi.

134. At no time did Waterway provide Aoyagi with any reasonable accommodation.

135. At no time did Waterway provide Aoyagi with a request for reasonable accommodation form.

136. Since at least 2017, Waterway has engaged in unlawful employment practices in violation of Section 102 of Title I and Section 503 of Title V of the ADA, 42 U.S.C. § 12112 and 42 U.S.C. § 12203.

## FIRST CLAIM FOR RELIEF

### Disparate Treatment Based on Disability and/or the Need to Provide Accommodation (42 U.S.C. §§ 12112(a) and (b)(5)(B))

137. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

138. At all relevant times, Aoyagi was an individual with a disability under 42 U.S.C. § 12102.

139. At all relevant times, Aoyagi was qualified and able to perform the essential functions of his position at Waterway, with or without reasonable accommodation.

140. Waterway took adverse action against Aoyagi by discharging him.

141. Waterway discharged Aoyagi because of his disability, epilepsy, or because of the need to reasonably accommodate his disability, epilepsy.

142. Waterway denied Aoyagi employment opportunities because of his disability and/or because of the need to provide reasonable accommodation for his disability in violation of Sections 102(a) and 102(b)(5)(B) of the ADA, 42 U.S.C. §§ 12112(a) and (b)(5)(B).

143. The effect of the practices complained of in the foregoing paragraphs has been to deprive Aoyagi of equal employment opportunities because of his disability.

144. The effect of the practices complained of in the paragraphs above has been to inflict emotional pain, suffering, and inconvenience upon Aoyagi and to deprive him of the financial and other benefits of working for Waterway.

145. The unlawful employment practices complained of in the forgoing paragraphs were intentional.

146. The unlawful employment practices complained of in the forgoing paragraphs were done with malice or reckless indifference to Aoyagi's federally protected rights.

## SECOND CLAIM FOR RELIEF

### Denial of Reasonable Accommodation
### (42 U.S.C. § 12112(8)-(10))

147. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

148. At all relevant times, Aoyagi was an individual with a disability under 42 U.S.C. § 12102.

149. At all relevant times, Aoyagi was qualified and able to perform the essential functions of his position at Waterway, with or without reasonable accommodation.

150. On or around June 1, 2017, Aoyagi requested that Waterway provide reasonable accommodation for his disability, epilepsy.

151. Reasonable accommodations were available which would have enabled Aoyagi to perform the essential functions of his job.

152. Waterway had an obligation to engage in the interactive process to determine whether one or more reasonable accommodations were available to Aoyagi to perform the essential functions of his job.

153. Waterway refused to talk to Aoyagi about his request for reasonable accommodation.

154. Waterway failed to engage in the interactive process with Aoyagi to determine whether some reasonable accommodation could be provided.

155. Waterway failed to perform an individualized assessment as to whether Aoyagi was capable of performing the essential functions of his position at Waterway, with or without reasonable accommodation.

156. Waterway denied Aoyagi's request for reasonable accommodations.

157. By refusing to provide Aoyagi with reasonable accommodations, Waterway violated Sections 102(a) and 102(b)(5)(A) of Title I of the ADA, 42 U.S.C. §§ 12112(a) and 12112(b)(5)(A).

158. The effect of the practices complained of in the foregoing paragraphs has been to deprive Aoyagi of equal employment opportunities because of his disability.

159. The effect of the practices complained of in the paragraphs above has been to inflict emotional pain, suffering, and inconvenience upon Aoyagi and to deprive him of the financial and other benefits of working for Waterway.

160. The unlawful employment practices complained of in the forgoing paragraphs were intentional.

161. The unlawful employment practices complained of in the forgoing paragraphs were done with malice or reckless indifference to Aoyagi's federally protected rights.

### THIRD CLAIM FOR RELIEF

**Retaliation**
**(42 U.S.C. § 12203)**

162. The EEOC reasserts and incorporates by reference all of the foregoing allegations.

163. At all relevant times, Aoyagi was an individual with a disability under 42 U.S.C. § 12102.

164. At all relevant times, Aoyagi was qualified and able to perform the essential functions of his position at Waterway, with or without reasonable accommodation.

165. By requesting reasonable accommodation from Waterway, Aoyagi engaged in protected activity under the ADA.

166. After Aoyagi requested accommodation, Waterway discharged him.

167. Waterway discharged Aoyagi in retaliation for his protected activity, requesting reasonable accommodation under the ADA.

168. Waterway engaged in unlawful employment practices, in violation of Section 503 of the ADA, 42 U.S.C. § 12203, by retaliating against Aoyagi because he requested reasonable accommodation and engaged in protected activity.

169. The effect of the practices complained of in the forgoing paragraphs has been to deprive Aoyagi of equal employment opportunities because he engaged in protected activity.

170. The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Aoyagi and to deprive him of the financial and other benefits of working for Waterway.

171. The unlawful employment practices complained of in the forgoing paragraphs were intentional.

172. The unlawful employment practices complained of in the forgoing paragraphs were done with malice or reckless indifference to Aoyagi's federally protected rights.

**PRAYER FOR RELIEF**

Wherefore, the EEOC respectfully requests that this Court:

A.  Grant a permanent injunction enjoining Waterway, its officers, agents, servants, employees, successors, assigns and all persons in active concert or participation with Waterway, from engaging in any employment practice which discriminates on the basis of disability, and from retaliating against employees who oppose such unlawful employment practices.

B.  Order Waterway to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of its past and present unlawful employment practices.

C.  Order Waterway to make whole Aoyagi, by providing appropriate backpay and lost benefits with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to the reinstatement of Aoyagi, or front pay in lieu thereof.

D.  Order Waterway to make whole Aoyagi by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to relocation expenses, job search expenses, and medical expenses, in amounts to be determined at trial.

E.  Order Waterway to make whole Aoyagi by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, loss of credit standing, and stress, in amounts to be determined at trial.

F.  Order Waterway to pay Aoyagi punitive damages for its malicious or reckless conduct described in the paragraphs above, in amounts to be determined at trial.

    G.    Grant such further relief as this Court deems necessary and proper in the public interest.

    H.    Award the EEOC its costs of this action.

RESPECTFULLY SUBMITTED this 11th day of September, 2019.

Sharon Fast Gustafson
General Counsel

Gwendolyn Reams
Associate General Counsel

Mary Jo O'Neill
Regional Attorney
Phoenix District Office

Rita Byrnes Kittle
Supervisory Trial Attorney

*/s/ Laurie Jaeckel*
Lauren Jaeckel
Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Denver Field Office
303 E. 17th Avenue, Suite 410
Denver, CO 80203
Phone: 303-866-1381
Email: lauren.jaeckel@eeoc.gov

**PLEASE NOTE**: For purposes of service upon the EEOC, it is sufficient that pleadings, notices, and court documents be served upon the Trial Attorneys. Duplicate service is not required on the General Counsel and Associate General Counsel in Washington, D.C.